## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| TRINITY INDUSTRIES LEASING COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 13 C 439 |
| MIDWEST GAS STORAGE, INC., PUTNAM ENERGY LLC, TERRENCE O'MALLEY, and DEBORAH J. O'MALLEY, | ) ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) ) | |

### MEMORANDUM AND OPINION

Plaintiff Trinity Industries Leasing Company ("Trinity") filed this action against Defendants Midwest Gas Storage, Inc. ("Midwest Gas"), Putnam Energy LLC ("Putnam Energy"), Terrence O'Malley, and his wife Deborah J. O'Malley, alleging a host of claims related to the breach of a 2007 contract for the lease of railcars between Trinity and Indiana Corn Products, LLC ("Indiana Corn"). After Indiana Corn failed to make regular monthly payments, Plaintiff terminated the lease and repossessed its railcars in November 2008. Plaintiff then filed suit against Indiana Corn in Texas state court for breach of contract. On August 7, 2009, the Texas court entered a default judgment against Indiana Corn for more than nine million dollars, multiples of the unpaid lease amount. Plaintiff has yet to recover on that judgment.

In the case before this court, Plaintiff claims that, as of September 2006, Indiana Corn was an "empty shell" corporation, which Defendant Mr. O'Malley, as "president and chief executive officer," used to carry out a scheme to defraud Plaintiff. Mr. O'Malley is the thread tying each of the Defendants to Plaintiff's lease with Indiana Corn: both Midwest Gas and Putnam Energy are allegedly "controlled and/or owned in whole or part" by the O'Malleys, and received some of the proceeds from a sublease of the railcars. Seeking to recover on its judgment against Indiana Corn, Plaintiff has asserted an alter ego claim and various state law

claims, including fraud or tortious interference against Mr. O'Malley, and has made allegations of fraudulent transfer and equitable "claims" of "money had and received," unjust enrichment, and constructive trust against all Defendants. Defendants move to dismiss the first amended complaint for failure to state a claim. For reasons discussed herein, Defendants' motion [94] is granted in part and denied in part.

## BACKGROUND

The following alleged facts are drawn from the First Amended Complaint and from the lease and sublease attached to it. The facts are set forth in a light most favorable to Plaintiff.

### I. Factual Background

Plaintiff Trinity is "in the business of leasing railcars to meet the freight railcar needs of industry." (Pl.'s First Am. Compl. [92], hereinafter "Am. Compl.," ¶ 13.) On March 13, 2007, Plaintiff and Indiana Corn, a Delaware limited liability company with its principal office in Illinois, entered into a ten-year lease agreement in which Plaintiff agreed to lease 150 railcars to Indiana Corn in exchange for a monthly payment of $650 per car through October 31, 2008, and $732 per car beginning November 1, 2008. (Trinity Indus. Leasing Co. R.R. Car Lease Agreement, Ex. 1 to Am. Compl., hereinafter "Lease," at 1–2; Rider One (1) to R.R. Car Lease Agreement, Ex. 1 to Am. Compl., hereinafter "Rider," at 1–2.) Plaintiff alleges that Jim Zegar, the chief financial officer of Indiana Corn, acted "at the direction and under the control of [Mr.] O'Malley," when he signed the lease on behalf of Indiana Corn. (Am. Compl. ¶¶ 13, 28.) To carry out the lease, Plaintiff purchased 150 new railcars, which "were built and delivered as directed by [Mr.] O'Malley" before June 1, 2007, and Indiana Corn was obligated to begin monthly payments ($97,500 per month) soon thereafter. (*Id.* ¶¶ 31–32.) Rent for the railcars was pro-rated for the first month and thereafter was due before the first day of the month. (Lease.)

Plaintiff and Indiana Corn's relationship went south almost immediately. Plaintiff alleges that Mr. O'Malley, acting on behalf of Indiana Corn, "never had any intention of paying [Plaintiff]," but rather plotted a "scheme" to "use the corporate form" to lease railcars from

Plaintiff, sublease the same railcars to other companies, and then funnel the sublease proceeds to himself personally and other entities in which he had an interest. (Am. Compl. ¶ 23.) Indiana Corn did sublease the railcars to ConAgra in April 2007, and never made any lease payments to Plaintiff in 2007. (*Id.* ¶¶ 30, 41.) ConAgra, meantime, made regular monthly payments to Indiana Corn, the proceeds of which Plaintiff alleges were transferred to Mr. O'Malley personally, to Midwest Gas, to Putnam Energy, and to Hartford Bio-Energy ("HBE"). (*Id.* ¶¶ 34–39, 41.) These transfers had no legitimate business purpose, Plaintiff contends, and are not properly documented. (*Id.* ¶¶ 48–49.) After Indiana Corn's board allegedly terminated Mr. O'Malley's "exclusive control" over Indiana Corn's bank account, on March 18, 2008, Indiana Corn finally began making monthly lease payments to Plaintiff, but has not paid the amount past due. (*Id.* ¶¶ 45, 47.)

### A. Negotiating the Lease Agreement: March 2006 – March 2007

In order to carry out his scheme, Plaintiff alleges that Mr. O'Malley induced Plaintiff to enter into the lease by misrepresenting the viability and financial condition of Indiana Corn. In March 2006, Mr. O'Malley, on behalf of Indiana Corn, approached Plaintiff seeking to lease railcars. (Am. Compl. ¶ 13.) As part of the negotiations, Mr. O'Malley represented to Mike Meaney, a "Trinity executive" (Defs.' Reply in Supp. of Am. Mot. to Transfer or Dismiss [65], at 4), that "Indiana Corn operated two ethanol plants," one in Cloverdale, and another in Hartford City, Indiana, named "Hartford Bio-Energy," each of which "produced 88 million gallons of ethanol from 35 million bushels of corn" annually. (Am. Compl. ¶ 14.) Mr. O'Malley also assured Mr. Meaney, both in person and on the phone, that Indiana Corn was a "fully funded, operational and viable entity," a representation that Mr. O'Malley allegedly "repeated . . . both expressly and through many implications from March 2006 through June 2007." (*Id.*)

In reality, Plaintiff claims, at the time that the parties were negotiating this lease, Indiana Corn was in the process of selling its business. On or around September 15, 2006, Indiana Corn "closed a sale that had been in progress for months and was committed to by no later than

July 2006," which "disposed of virtually all of [its] assets, including all of its land, permits, and plans" and distributed sales proceeds to its members. (*Id.* ¶ 19.) Indiana Corn also "transferred all of its vehicles, computers, and other office equipment to other entities including HBE [Hartford Bio-Energy]." (*Id.*) By November 2006, Indiana Corn allegedly had "no employees," "no assets," and "no operations." (*Id.* ¶¶ 57(a)–(c).) Furthermore, as part of the sale, Indiana Corn and its owners had signed a non-compete agreement, that Plaintiff asserts, "prevented [Indiana Corn] from realistically engaging in any business whatsoever." (*Id.* ¶ 57(e).) Though Indiana Corn initially retained a water pipeline easement used by the Cloverdale plant, Plaintiff claims that this was due to "an oversight by the buyer," corrected on December 18, 2007, when the original buyer purchased that final asset for $600,000. (*Id.* ¶ 40.) And, contrary to Mr. O'Malley's representations, Indiana Corn never owned or controlled HBE; instead, Mr. O'Malley was both president and 40% owner of HBE, "a highly speculative venture that was never capitalized sufficiently to enable it to begin any operations at all." (*Id.* ¶¶ 20, 57(m).)

As to the financial condition of Indiana Corn, on July 24, 2006, Jim Zegar, Indiana Corn's chief financial officer, "at the direction and under the control of [Mr.] O'Malley" allegedly represented to Plaintiff that Indiana Corn expected to make $250,000,000 in future annual sales. (*Id.* ¶ 18.) Then, in November 2006, Mr. O'Malley provided Plaintiff with a written statement of Indiana Corn's financial condition as of November 22. (*Id.* ¶ 17.) According to that statement, Indiana Corn had: (1) $571,099.45 in "cash or cash equivalents;" (2) "fixed assets in the form of a pipeline, plant construction, vehicles and office equipment worth at least $873,008.41;" (3) "stock worth over $23,000,000 in an entity by the name of 'Altra';" (4) "less than $300,000" in liabilities "including all of its accounts payable and payroll;" and (5) no outstanding debts to individuals. (*Id.*) Either O'Malley or Zegar also "expressly represented" that "HBE did not have a receivable owed to it from any related or affiliated entities." (*Id.* ¶ 55(j).) Had these representations been truthful, Plaintiff contends, they would mean that "Indiana Corn

had adequate working capital and assets to operate a business and lease the railcars with a realistic potential of generating much more capital." (*Id.* ¶ 18.)

In fact, as of November 22, 2006, Indiana Corn allegedly had "less than $140,000" in available cash. (*Id.* ¶ 19.) Furthermore, Plaintiff claims, Indiana Corn never owned $23,000,000 in Altra stock; rather, Mr. O'Malley and other Indiana Corn members received Altra stock "personally" as part of the September 15 sale. (*Id.* ¶ 21.) Neither O'Malley nor Zegar disclosed the September 15 sale or its impact on Indiana Corn's financial condition to Plaintiff. (*Id.* ¶ 22.)

After providing Plaintiff with the false financial statement, on November 30, Mr. O'Malley and Mr. Zegar "began systematically transferring any cash that Indiana Corn had in its bank account" to Mr. O'Malley and entities in which he had an interest, including Putnam Energy, Midwest Gas, and HBE. (*Id.* ¶ 24.) Specifically, Plaintiff alleges, Indiana Corn made the following transfers without receiving any consideration in return: (1) $100,000 to Putnam Energy, noted as a personal transfer to Mr. O'Malley, on November 30; (2) $30,000 to HBE, on November 30; and, after receiving additional funds for sale of its assets, (3) $200,000 to HBE on December 22. Finally, between January and April 2007, Plaintiff asserts that Indiana Corn spent $191,535.06 "on professional fees, travel and entertainment, and activities for a right of way" on behalf of Putnam Energy and Midwest Gas. (*Id.* ¶¶ 24–27.)

**B.    Indiana Corn's Delinquency: June 2007 – March 2008**

After delivery of the railcars in June 2007, Indiana Corn failed to make a single payment until March 2008. (*Id.* ¶¶ 41, 45, 47.) When Plaintiff questioned Indiana Corn about its failure to pay rent, Mr. O'Malley allegedly explained that "Indiana Corn was having some financial difficulties because some of its investment funding was 'tied up'" (*Id.* ¶ 41), but he expected the "already committed" money within one to two months. (*Id.* ¶ 55(m).) In reality, Plaintiff claims, Indiana Corn had sold most of its assets by September 2006. (*Id.* ¶ 19.)

Though Indiana Corn was paying nothing for the railcars, the railcars were generating revenue for Indiana Corn. Not even one month after executing the lease with Plaintiff, in an agreement dated April 2, 2007, Indiana Corn agreed to sublease all the railcars to ConAgra through April 30, 2009. (Am. Compl. ¶ 30; Railcar Sublease Agreement, Ex. 2 to Am. Compl., hereinafter "Sublease," at 1). ConAgra began making regular monthly payments to Indiana Corn after delivery of the railcars in June 2007 and continuing through November of that year.[1] On June 8, 2007, Plaintiff asserts, Indiana Corn issued its first two invoices to ConAgra for subletting the railcars, one for $146,250 and another for $97,500, which ConAgra promptly paid on June 22 and July 16 or 17, respectively. (Am. Compl. ¶¶ 33–35.) After making these first two payments, ConAgra continued to make regular monthly payments to Indiana Corn: $97,500 on August 7, $97,500 on September 7, $97,508.69 on October 9, and $97,617.07 on November 5. (*Id.* ¶¶ 34–39, 41.)

Plaintiff never received any payments from Indiana Corn in 2007. Instead, ConAgra's sublease payments "were transferred out of Indiana Corn to [Mr.] O'Malley personally and into the other entities owned or controlled by [the O'Malleys] . . . including Putnam Energy and Midwest Gas." (Am. Compl. ¶ 23.) Nor did Indiana Corn receive any consideration in exchange for at least some of these transfers. (*Id.* ¶¶ 34, 35, 39.) Between June 22, 2007, when Indiana Corn received its first sublease payment from ConAgra, and November 26, 2007, Plaintiff alleges that Indiana Corn "at [Mr.] O'Malley's direction" (*id.* ¶¶ 34–39) made the following transfers and payments:

- $40,000 to HBE on June 28, 2007 (*id.* ¶ 34);
- $100,000 to HBE on July 2, 2007 (*id.*);
- $40,292 on July 26, 2007 to Allen and Terri Grayson, who allegedly "were performing work for a right of way for Putnam Energy" (*id.* ¶ 35);
- $20,000 to HBE on July 30, 2007 (*id.*);

---

[1] Though Plaintiff did not repossess its railcars until November 2008 (Am. Compl. ¶ 50), and Indiana Corn's sublease did not terminate until April 2009 (*id.* ¶ 30), Plaintiff does not allege that Indiana Corn received any sublease payments after November 2007.

- $40,000 to Union Pacific and BNSF Railroads on July 30, 2007 in two checks signed by Mr. O'Malley, allegedly for delivery of railcars to ConAgra (*id.*);
- $6,000 to S & S Construction on July 31, 2007 in a check signed by Mr. O'Malley, allegedly for construction work performed for Putnam Energy and Midwest Gas (*id.*);
- $40,000 to HBE on or around August 8, 2007 (*id.* ¶ 36);
- $56,823.87 to BNSF, Norfolk Southern and Union Pacific Railroads on August 13, 2007 in checks drafted and signed by Mr. O'Malley, allegedly for "rail transportation costs," which the court presumes were from Indiana Corn's account (*id.*);
- $2,500 to Richard Moore, a Midwest Gas employee, on or around August 15, 2007 in a check signed by Mr. O'Malley, and subsequently, five other similar payments (*id.*);
- $10,000 to HBE on or around September 7, 2007 (*id.* ¶ 37);
- $15,000 to HBE on or around September 19, 2007 (*id.*);
- $10,000 to HBE on or around October 11, 2007 (*id.* ¶ 38);
- $10,000 to HBE on or around October 16, 2007 (*id.*);
- $10,000 to HBE on or around October 17, 2007 (*id.*);
- $10,000 to HBE on or around October 18, 2007 (*id.*);
- $5,000 to HBE on October 31, 2007 (*id.*);
- $5,000 to HBE on or around November 2, 2007 (*id.* ¶ 39);
- $5,000 to HBE on or around November 9, 2007 (*id.*);
- $22,000 to HBE on or around November 22, 2007 (*id.*);
- $50,000 to Mr. O'Malley on or around November 26, 2007 (*id.*); and
- $19,435 for insurance on an unspecified date, when Indiana Corn allegedly "had no property, and no operations to insure." (*Id.* ¶ 37).

HBE then allegedly transferred the money that it received from Indiana Corn to Defendants Mr. O'Malley, Putnam Energy, and Midwest Gas (Am. Compl. ¶ 95) through the following payments:

- Personal expenses, including "credit card bills, electricity bills, lawn care expenses, and Direct T.V. expenses," of Mr. O'Malley by check in October 2007 (*id.* ¶¶ 38, 95);
- $29,403.34 for real estate taxes on property owned by Mr. O'Malley on February 14, 2008 (*id.* ¶ 97); and
- $69,648.42 for payroll for Midwest Gas and Putnam Energy on November 30, December 14, December 26, December 28, 2007, and January 11, January 12, January 23, January 25, February 1, February 9, March 9, April 1, and May 1, 2008. (*Id.*)

Even after receiving additional income from the sale of the Cloverdale plant's water pipeline easement to the original buyer from the September 2006 sale, Indiana Corn paid no rent until March 2008. On December 18, 2007, Indiana Corn sold the easement for $600,000 and deposited $485,218.21 into its bank account. (*Id.* ¶ 40.) Plaintiff does not know what happened

to the difference ($114,781.79), but notes that "[i]n the following three months" Indiana Corn transferred over $330,000 "in cash" to HBE. (*Id.* ¶¶ 40–41.)[2]

### C. Indiana Corn as Alter Ego of Mr. O'Malley Through March 2008

Until Indiana Corn's board removed Mr. O'Malley from sole control over Indiana Corn's financial accounts in March 2008, Plaintiff asserts, O'Malley operated Indiana Corn as his alter ego. Indiana Corn allegedly did not maintain corporate formalities, and has failed to comply with subpoenas requesting organizational meeting minutes, articles of organization, or "other fundamental records." (Am. Compl. ¶ 72.) Nor did Indiana Corn keep its finances in order: Plaintiff alleges that Indiana Corn did not maintain accurate financial records, "timely and properly file tax returns;" keep an accurate account of its members' capital contributions; or "declare[] a dividend or proper distributions." (*Id.* ¶ 73.) And, Plaintiff asserts, Indiana Corn's board of directors did not approve the lease or appear to have any budget or business plan related to the lease. (*Id.* ¶ 72.) In fact, Plaintiff alleges, Indiana Corn was undercapitalized from its inception, as the ethanol plant that it sought to run "was never fully developed or operable." (*Id.* ¶ 71.) By March 2007, Indiana Corn was insolvent; it had sold most of its assets in September 2006, and had debts and liabilities that exceeded its assets. (*Id.* ¶¶ 46, 74.) And, between June 2007 and March 2008, Indiana Corn was not making any regular lease payments to Plaintiff. (*Id.* ¶ 74.)

During this period, Mr. O'Malley allegedly "controlled and dominated" Indiana Corn, HBE, and Defendants Putnam Energy and Midwest Gas. (*Id.* ¶ 42.) Plaintiff urges that

---

[2] Plaintiff's allegations regarding transfers to and through HBE after the sales are not models of clarity. For example, after alleging that Indiana Corn transferred $330,000 to HBE, Plaintiff claims to "trac[e]" this money to funds spent by HBE and, in the next sentence, identifies a specific transfer of $101,321 from Indiana Corn to HBE's payroll. (Am. Compl. ¶ 41) The court is uncertain whether this specific transfer was in addition to or included in the $330,000 transfer. Furthermore, after alleging specific payments made by HBE to Midwest Gas and Putnam Energy, Plaintiff states that on four separate dates "an additional $11,500 was transferred by check to [Mr.] O'Malley personally," but does not say whether these check transfers were from Indiana Corn or HBE. (*Id.*)

O'Malley "intermingled [the] cash, employees, and assets" of these four entities as they "operated out of the same office," and shared employees and a phone number, which was "answered in a variety of ways without any discernable consistency." (*Id.*)  For example, Plaintiff alleges that as part of the September 2006 sale of Indiana Corn's assets, the buyer "paid off debts belonging to O'Malley personally and/or Putnam Energy," and paid individual Indiana Corn members personally in Altra stock.  (*Id.* ¶ 46.)  Mr. O'Malley also allegedly "had complete control over the bank accounts of Indian[a] Corn, HBE, Putnam Energy and Midwest Gas." (*Id.* ¶ 25.)

After Indiana Corn sold its pipeline easement in December 18, 2007, Mr. O'Malley took the position[3] that Putnam Energy and Midwest Gas had owned the easement, and were therefore entitled to keep the proceeds, but the other Indiana Corn members and officers disagreed, asserting that the easement had belonged to Indiana Corn.  (Am. Compl. ¶ 43.)  This issue was never resolved, Plaintiff alleges, because "O'Malley [had] intermingled all of his companies' assets so completely that it was impossible for all of [the] board members to reach any final agreement as to what asset belonged to which entity." (*Id.* ¶ 44.)  Rather, the board voted (on an unspecified date), with Mr. O'Malley opposed, to open a new bank account, requiring two signatures for any checks that exceeded $5,000, and to deposit the sales proceeds into the new account.  (*Id.* ¶ 45.)  Despite these measures, the proceeds were divided among O'Malley, HBE, and other board members; Indiana Corn did not receive any of the pipeline revenue.  (*Id.*)  It was not until March 18, 2008, that Indiana Corn began to make regular lease payments to Plaintiff.  (*Id.* ¶¶ 45, 47.)

### D.    Repossession & Default Judgment: March 2009 – July 2010

Even after Plaintiff began the process of recovering possession of its railcars and monetary damages for breach of contract, Plaintiff alleges that Mr. O'Malley continued to

---

[3]    Plaintiff does not allege where or how Mr. O'Malley made these claims.

misrepresent Indiana Corn's financial condition and the interests that each owner, including Mr. O'Malley, had in Indiana Corn.  In October 2008, Plaintiff demanded repayment of rent owed by Indiana Corn, but Indiana Corn still failed to pay.  (Am. Compl. ¶ 50.)  One month later, on November 13, 2008, Plaintiff "terminated Indiana Corn's right to possession of the railcars and demanded their return." (*Id.*).  Plaintiff regained possession of all the railcars on or about November 30, 2008 (*id.*), and filed suit against Indiana Corn in Texas state court for breach of contract seeking damages on December 15, 2008.  (*Id.* ¶ 51.)  As this court understands the parties' agreement, by this time, Indiana Corn owed $877,500 ($97,500 per month for nine months) plus accrued interest.  Indiana Corn did not defend this lawsuit, however, and on August 7, 2009, the Texas court rendered a default judgment for more than ten times the unpaid rent against Indiana Corn:  $9,870,486.22.  (*Id.*)

Before entry of the judgment, Plaintiff communicated with Indiana Corn by certified mail. In response, Mr. O'Malley stated on March 3, 2009 that he "believed" that Indiana Corn had subleased the railcars to ConAgra, but represented that "he had no information or knowledge" concerning Indiana Corn's own performance on the lease.  (*Id.* ¶¶ 55(n)–(o).)  Instead, Mr. O'Malley represented: (1) he was unaware that Indiana Corn was delinquent in its lease payments; (2) Indiana Corn had sufficient funds to make regular lease payments; (3) he had no control over Indiana Corn or its financial accounts as he had been voted off of the board; and (4) Robinson, DeBlois, and Zegar had control of Indiana Corn's financial accounts and "must have pocketed the money" if Indiana Corn was not making regular lease payments.  (*Id.*)

Then, after entry of the judgment, on November 19, 2009, at his Illinois office, Mr. O'Malley allegedly told Plaintiff's representative Eric Marchetto that Robinson, DeBlois, and Zegar had moved all of Indiana Corn's documents and computers to Indianapolis, that he retained a "few" boxes "of little value," and that "he had no other documents, knowledge or information about" the Lease, but intimated "that [Zegar, DeBlois, and Robinson] may be using Indiana Corn's assets to operate their other businesses." (*Id.* ¶ 55(p).)

Finally, at a deposition on July 29, 2010, Mr. O'Malley stated under oath that there was "no relationship" between Indiana Corn, Midwest Gas, and Putnam Energy, and that Indiana Corn "never paid any payroll, rent, or other expenses for Midwest Gas or Putnam Energy." (*Id.* ¶ 55(q).) Mr. O'Malley testified that he was not aware of Indiana Corn's transfers to other entities owned or controlled by him, nor of Indiana Corn's distributions to its members. (*Id.*) And, though O'Malley himself persuaded Plaintiff to lease the railcars to Indiana Corn, O'Malley testified that he had no knowledge of Indiana Corn's lease with Plaintiff.

In reality, Plaintiff claims, all of the representations made on March 3, 2009, November 19, 2009, and July 29, 2010 were false, and made by Mr. O'Malley "with the specific intent to deceive, mislead and defraud [Plaintiff]." (*Id.* ¶ 56.) By way of his misrepresentations and concealments, Plaintiff asserts, Mr. O'Malley "intentionally and deliberately led [Plaintiff] to believe that [it] could and should recover from other members of Indiana Corn," and in doing so, "hindered and delayed" Plaintiff's "investigation" of Mr. O'Malley and the other entities which he controlled and/or owned. (*Id.* ¶¶ 55(o), 58.) As a result, Plaintiff sought a "meaningless judgment against Indiana Corn" and recovery on that judgment from "Robison, Zegar, and DeBlois," instead of from "[Mr.] O'Malley, Midwest Gas, and Putnam Energy." (*Id.* ¶ 64.)

Plaintiff alleges that Defendants caused it over $9,000,000 in actual, monetary damages "less any mitigation that [Plaintiff] is able to accomplish," (*id.* ¶¶ 68, 81, 87), and seeks monetary damages, avoidance of fraudulent transfers, and/or equitable relief. Plaintiff also seeks exemplary damages against Mr. O'Malley and attorney's fees on the fraudulent transfer claim.

## II. Procedural Background

As noted, before filing this lawsuit, Plaintiff won a default judgment in Texas state court against Indiana Corn in the amount of $9,870,486.22. (Am. Compl. ¶ 51.) To date, Plaintiff apparently has been unable to recover on that default judgment. In this lawsuit, as well, Plaintiff seeks damages for Indiana Corn's original breach of contract, but also asserts additional claims, against different parties, allegedly undiscoverable until October 2011. (*Id.* ¶ 67.) Because this

new suit seeks to enforce, and not attack, the state court judgment, it is not barred by the default judgment itself. *See Matthews Constr. Co., Inc. v. Rosen*, 796 S.W.2d 692, 694 (Tex. 1990); *see also JNS Aviation, Inc. v. Nick Corp.*, 418 B.R. 898, 910–11 (N.D. Tex. 2009) (citing *Matthews* and recognizing the propriety of veil-piercing litigation to enforce a default judgment against a corporation which has transferred all of its assets to another entity). Any recovery obtained by Plaintiff in this case will be limited to the amount not recovered from the state court default judgment.

Plaintiff originally filed this case in the United States District Court for the Southern District of Indiana on November 29, 201. (Compl. [1].) Judge Jane Magnus-Stinson granted Defendants' motion to transfer the case under 28 U.S.C. § 1404(a) to this court on January 18, 2013. (Order [75].) The court has jurisdiction under 28 U.S.C. § 1332, as Plaintiff seeks $9,000,000 in monetary damages and Plaintiff and Defendants are citizens of different states: Plaintiff, Trinity, is a Delaware corporation with its principal place of business in Texas; Defendants Mr. and Ms. O'Malley are Illinois citizens; Defendant Midwest Gas is an Indiana corporation with its principal place of business in Illinois; and Defendant Putnam Energy is an Indiana limited liability company whose members are citizens of both Illinois and California. (Am. Compl. ¶¶ 4–5, 7–9.) Defendant filed a motion to dismiss for failure to state a claim and for failure to adhere to proper pleading standards, which is now before the court.

**DISCUSSION**

## I.    Standard of Review

Generally, a complaint must contain "a short and plain statement" of the court's jurisdictional grounds, the claim for which the pleader is entitled to relief, and a demand for relief. FED. R. CIV. P. 8(a). On review of a complaint challenged by a motion to dismiss, the court will accept the well-pleaded allegations of the complaint as true, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and will draw all reasonable interferences in favor of the non-moving party. *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007). Construing

the line of Supreme Court precedent established in *Twombly*, *Erikson v. Pardus*, 551 U.S. 89 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Seventh Circuit has concluded that a court may reject allegations that are "so sketchy or implausible that they fail to provide sufficient notice" of the claims. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

In order to survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), Plaintiff must allege facts sufficient to demonstrate a plausible right to relief, going beyond mere speculation, "labels and conclusions," or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. "[A] plaintiff's claim need not be probable, only plausible," but must provide "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" that supports the allegations. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012) (quoting *Twombly*, 550 U.S. at 556).

Fraud claims must satisfy a heightened pleading standard. Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). The Seventh Circuit has held that the "circumstances of fraud or mistake" include "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078 (7th Cir. 1997) (citations omitted); *see Moss v. Healthcare Compare Corp.*, 75 F.3d 276, 281 (7th Cir. 1996) (reasoning that to satisfy Rule 9(b), a plaintiff must plead "the who, what, when, where, and how: the first paragraph of any newspaper story") (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990)).

## II.    Choice of Law

The court must first determine what state's law applies to Plaintiff's claims. A federal court sitting in diversity generally must apply the forum state's choice of law rules in order to determine the applicable substantive law. *Sound of Music Co. v. Minn. Min. & Mfg. Co.*, 477

F.3d 910, 915 (7th Cir. 2007). Where, as here, the case has been transferred pursuant to 28 U.S.C. § 1404(a), the court will apply the choice of law rules of the transferor court, in this case, that of Indiana. *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). "[B]efore entangling itself in messy issues of conflict of laws" this court will "satisfy itself that there actually is a difference between the relevant laws of the different states." *Barron v. Ford Motor Co. of Can. Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992).

### III.    Count 1: Fraud

#### A.    Choice of Law

Both sides agree that Texas law applies to Plaintiff's fraud claim. (Am. Compl. ¶ 12; Defs.' Mot. at 5). Nor is there a "true conflict" between Indiana and Texas fraud law that is "important enough to affect the outcome of the litigation." *Simon v. United States*, 805 N.E.2d 798, 804–05 (Ind. 2004) (citation omitted). Under both Indiana and Texas law, in order to establish fraud, a plaintiff must prove that the defendant made a false, material representation with knowledge or reckless disregard of its falsity, intending plaintiff to act in reliance on the representation, and that plaintiff did, in fact, act on defendant's representation, resulting in injury. *Compare Lawyers Title Ins. Corp. v. Pokraka*, 595 N.E.2d 244, 249 (Ind. 1992), *with Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 53 Tex. Sup. Ct. J. 89, 297 S.W.3d 768, 774 (2009). The court will therefore apply Texas law to Plaintiff's fraud claim.

Texas law applies to the extent that Plaintiff's fraud claim rests on breach of fiduciary duty, as well. Plaintiff concedes that Texas law is called for by the choice of law provision included in both the lease and sublease (Am. Compl. ¶ 12), but urges that Delaware law governs the question of whether Mr. O'Malley owed Plaintiff a fiduciary duty under the trust fund doctrine. (Resp. at 11 n.7.) In general, Indiana's choice of law rules do not recognize *dépeçage*–that is, "the process of analyzing different issues within the same case separately under the laws of different states." *Simon*, 805 N.E.2d at 801–03. As the Indiana Supreme Court explained in *Simon,* Indiana's choice of law rules permits courts to examine different

14

claims separately, but the use of *dépeçage* is problematic. *Id.* at 801–02. The court reasoned that "making separate determinations for each issue within a claim" may "produc[e] a hybrid" that "contravene[s] legislative intent" and state policy choices and "produce unfair results." *Id.* at 802–03. All of the issues within Plaintiff's fraud claim are governed by Texas law.

### B. Merits

In order to state a claim for fraud under Texas law, Plaintiff must prove the following elements: (1) Mr. O'Malley made "a material representation; (2) the representation was false; (3) when [O'Malley made] the representation . . . , [he] knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) [O'Malley] made the representation with the intent that [Plaintiff] should act upon it; (5) [Plaintiff] acted in reliance on the representation; and (6) [Plaintiff] thereby suffered injury." *Aquaplex*, 297 S.W.3d at 774. The representation must be both factual and material such that "a reasonable person would attach importance to and would be induced to act on [it]." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 54 Tex. Sup. Ct. J. 822, 341 S.W.3d 323, 337–38 (2011) (quotations omitted). In certain circumstances, a statement of opinion or a promise of future performance also may be actionable. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986); *Matis v. Golden*, 228 S.W.3d 301, 307 (Tex. Ct. App. 2007) (quoting *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930–31 (Tex. 1983)).

Plaintiff is required to satisfy the heightened pleading standard of Rule 9(b), and has done so here. As explained below, Plaintiff has alleged fraud based upon the representations that Mr. O'Malley made affirmatively before the lease, and upon his silence when he had a duty to disclose because of prior, conflicting representations. In addition, Plaintiff claims that O'Malley affirmative representations and concealed material facts during Indiana Corn's delinquency, and after repossession and entry of the default judgment. Those allegations, the court concludes, do not support a fraud claim.

### 1. False, material misrepresentations alleged

#### a. Affirmative Misrepresentations

##### i. Pre-lease representations

First, and most significant to Plaintiff's fraud claim, Plaintiff alleges with particularity that between March 2006 and March 2007, Mr. O'Malley made several affirmative, material misrepresentations concerning Indiana Corn's operations and financial condition, on which Plaintiff relied in entering into the lease:

- In March 2006, Mr. O'Malley represented to Plaintiff's employee in Illinois and Plaintiff's credit department in Texas that Indiana Corn operated two ethanol plants that produced 88 million gallons of ethanol per year, and was a "fully funded, operational and viable entity." (Am. Compl. ¶ 14.)

- Mr. O'Malley allegedly repeated that Indiana Corn was "fully funded, operational and viable" in person and on the phone, affirmatively and implicitly, between March 2006 and June 2007. (*Id.*)

- In November 2006, Mr. O'Malley represented in writing that as of November 22, 2006 Indiana Corn had $571,099.45 in "cash or cash equivalents," "fixed assets in the form of a pipeline, plant construction, vehicles and office equipment worth at least $873,008.41," "stock worth over $23,000,000 in an entity by the name of 'Altra'," "less than $300,000" in liabilities, and no outstanding debts to Mr. O'Malley or other entities. (*Id.* ¶ 17.)

Plaintiff has pleaded the circumstances of the alleged fraud that induced Plaintiff to enter into the lease with sufficient particularity. Furthermore, whether Indiana Corn was an ongoing entity, financially capable of making regular lease payments to Plaintiff, was material to Plaintiff's decision to enter into a contract with Indiana Corn; Plaintiff claims that it would not have entered into the lease with Indiana Corn, had it known the truth. (*Id.* ¶¶ 63–64.) These representations were false, Plaintiff asserts, because at the time they were made, Indiana Corn was either negotiating or closing a sale of its business, which "disposed of virtually all of [its] assets" and required the owners to sign non-compete agreements. (*Id.* ¶¶ 19; 57(e).)

The parties offer alternate characterizations of Mr. O'Malley's statements: Defendants argue that they are mere promises of future performance, and thus, not actionable, while Plaintiff urges that they are actionable regardless of whether they are interpreted as a statement

of fact, opinion, or promise. (Resp. at 9–10; Defs.' Mot. at 7.) The court agrees with Plaintiff that regardless of how O'Malley's statements are characterized,[4] the alleged false, material misrepresentations made by Mr. O'Malley over the course of his relationship with Plaintiff satisfy the particularity requirement necessary to survive a motion to dismiss.

### ii. Representations concerning ability to pay the judgment

Plaintiff has also alleged with particularity that Mr. O'Malley made affirmative, material misrepresentations to Plaintiff regarding Indiana Corn's ability to pay the default judgment. Plaintiff has not explained, however, how those later misrepresentations caused it injury. On March 3, 2009, in response to a letter while the Texas case was pending, Mr. O'Malley represented that Indiana Corn had sufficient funds to make regular lease payments, that he was unaware that it was delinquent, and that if Indiana Corn was delinquent, then Robinson, DeBlois, and Zegar "must have pocketed the money." (Am. Compl. ¶¶ 55(n)–(o).) Months later, when Plaintiff's representative visited Mr. O'Malley at his office in Illinois on November 19, 2009, Mr. O'Malley implied that Robinson, DeBlois, and Zegar may have used Indiana Corn's assets to further other businesses. (*Id.*) Finally, on July 29, 2010, Plaintiff asserts, Mr. O'Malley testified that there was "no relationship" between Indiana Corn, Midwest Gas, and Putnam Energy, and that Indiana Corn had not paid "any payroll, rent, or other expenses" for these entities. (*Id.* ¶ 55(q).)

Significantly, one of these statements was made well after Plaintiff had sued Indiana Corn, and two were made after Plaintiff had won a default judgment against it. The March 3 representation was material, as a reasonable person would "attach importance" and rely on the

---

[4]    For example, Plaintiff has alleged that O'Malley had special knowledge of Indiana Corn's financial condition (Am. Compl. ¶¶ 18–19), which may make a statement of opinion actionable. *See Matis*, 228 S.W.3d at 305, 307–08 (holding that even if the defendants' statements were "mere opinions," they could be actionable because the defendants had "special knowledge" to which the plaintiffs "did not have equal access."). Plaintiff also effectively alleged that Mr. O'Malley had no intent of performing on the lease (Am. Compl. ¶ 23), making a promise of future performance actionable. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 41 TEX. SUP. CT. J. 289, 960 S.W.2d 41, 48–49 (1998).

information provided by Mr. O'Malley to decide whether to seek a default judgment against Indiana Corn, but Plaintiff does not allege how it was injured or even influenced by the statement. Nor does Plaintiff explain how the two other misrepresentations, made by Mr. O'Malley *after* default judgment was entered against Indiana Corn, were material to its litigation strategy, or caused any additional injury. Plaintiff claims only that these misrepresentations "hindered and delayed [Plaintiff] in its investigation of O'Malley and caused [Plaintiff] to delay in pursuing O'Malley and his related entities." (Am. Compl. ¶¶ 55(o), 66). Plaintiff has not explained, for example, what assets would have been available to it, had it pursued O'Malley earlier or stated what it did or did not do to collect on its judgment, in reliance on these late misrepresentations. This general allegation, without any explanation of causation or actual injury, is insufficient to state a claim for fraud.

### iii. Representations during Indiana Corn's delinquency

Finally, Plaintiff claims that Mr. O'Malley made an affirmative, material misrepresentation concerning Indiana Corn's delinquent lease payments. Specifically, Plaintiff claims that at some point in 2007, O'Malley represented that "Indiana Corn was having some financial difficulties because some of its investment funding was 'tied up' but would be released in just another month or so. . . ." (Am. Compl. ¶¶ 41, 55(m).) Had Plaintiff known that this was not true, "it never would have shown any forbearance to Indiana Corn, and it would have pursued its claims against" O'Malley and the other Defendants earlier. (*Id.* ¶¶ 63, 64.)

Were it not for the heightened pleading standard for fraud, the court might well find these allegations sufficient. O'Malley's alleged lies about liquidity might well have dissuaded a reasonable person from acting quickly to repossess the railcars and sue other entities. The absence of detail concerning the precise dates and circumstances is troublesome, however. Indiana Corn began making lease payments in March of 2008; if O'Malley's alleged statement was made near the end of 2007, it could well have been truthful. More significantly, although Plaintiff has alleged that it was harmed by forbearance, it has not explained how. Were the

Defendants it has now sued solvent at that (unidentified) time, but insolvent now? Are there assets that would have been available to Plaintiff then, but are no longer? Without further information, the allegations do not support the conclusion that O'Malley's undated reassurances were an independent source of harm. Fraud claims arising from those assurances will be dismissed.

### b. Duty to disclose arising from prior affirmative misrepresentations

Plaintiff also alleges that Mr. O'Malley had a duty to disclose material facts to Plaintiff, arising from his prior affirmative, conflicting representations, which he breached by his silence. Defendants do not dispute that affirmative representations could, in some circumstances, give rise to a duty to disclose, but their interpretation of that duty is much narrower. Quoting two Texas court cases, Defendants argue that the duty to disclose arises only when the defendant knows that the other party is ignorant of the truth and does not have an equal opportunity to discover it. (Defs.' Mot. at 5–6) (quoting *Bradford v. Vento*, 44 TEX. SUP. CT. J. 655, 48 S.W.3d 749, 755 (2001) and *Reynolds v. Murphy*, 188 S.W.3d 252, 270 (Tex. App. Ct. 2006).)

As the *Bradford* case explains, whether Mr. O'Malley had a duty to disclose is a matter of law. *Bradford*, 48 S.W.3d at 755. Defendants' read of the scope of that duty is overly narrow. Under Texas law, the duty to disclose arises "where there is a formal fiduciary . . . . [or] confidential relationship between the parties;" further, "when [a person] voluntarily discloses information, he has a duty to disclose the whole truth;" and "when [a person] makes a representation, he has a duty to disclose new information when the new information makes that earlier representation misleading or untrue." *Playboy Enterprises, Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 259–60 (Tex. App. 2006).

Plaintiff has pleaded with particularity that Mr. O'Malley made several material misrepresentations to Plaintiff by remaining silent when circumstances changed such that his prior, affirmative representations became false or misleading. For example, in March 2006 O'Malley allegedly represented that Indiana Corn operated an ethanol plant in Cloverdale,

Indiana. Indiana Corn sold that plant in September 2006, however, and Mr. O'Malley never disclosed the sale. (Am. Compl. ¶¶ 14, 19.) And, between March 2006 and March 2007 O'Malley allegedly represented repeatedly that Indiana Corn was a "fully funded, operational and viable entity," but never disclosed that Indiana Corn sold most of its assets and its members signed a non-compete agreement in September 2006. (*Id.* ¶¶ 14, 19, 57(e).) Finally, in November 2006, O'Malley allegedly provided Plaintiff with a written statement of Indiana Corn's financial condition. Plaintiff alleges that statement was false at the time it was made, but also that O'Malley had a duty to disclose the fact that on November 30, he and Mr. Zegar allegedly began to transfer funds from Indiana Corn to himself personally and to other entities in which he had an interest. (*Id.* ¶¶ 17–19, 21–22, 24–26.) Each of these developments occurred months before Plaintiff and Indiana Corn signed the lease in March 2007, and created a duty on O'Malley to make corrective disclosures to Plaintiff.

### c.    Duty to disclose under trust fund doctrine

Plaintiff also alleges that Mr. O'Malley had a fiduciary duty to disclose that Indiana Corn was insolvent under the trust fund doctrine, and made a false, material representation by his silence. Under the equitable trust fund doctrine, directors of an insolvent corporation hold the assets of the corporation in trust for the creditors, and if the directors transfer those assets, creditors have a claim on them unless the assets have reached a bona fide purchaser without notice. BLACK'S LAW DICTIONARY (9th ed. 2009); *see also Hunter v. Fort Worth Capital Corp.*, 620 S.W.2d 547, 550 (Tex. 1981). The directors owe creditors a fiduciary duty to maintain the assets of the corporation, but the duty is to the corporation itself, not to the creditors individually, as creditors are deemed to have stepped into the shoes of shareholders during distribution of corporate assets.[5] *Henry I. Siegel Co., Inc. v. Holliday*, 663 S.W.2d 824, 827 (Tex. 1984);

---

[5]    Some courts have held that the trust fund doctrine may only be raised in a derivative action. *In re MortgageAmerica Corp.*, 714 F.2d 1266, 1276 (5th Cir. 1983) (applying Texas law); *In re Ritz*, 459 B.R. 623, 634–35 (Bankr. S.D. Tex. 2011) (same).

*Fagan v. LaGloria Oil & Gas Co.*, 494 S.W.2d 624, 628 (Tex. Civ. App. 1973). In Texas, the trust fund doctrine has been slowly abrogated by remedial statutes; Plaintiff and Defendants dispute whether the doctrine remains viable in Texas at all.[6] *See Hunter*, 620 S.W.2d at 551–52; *Smith v. Chapman*, 897 S.W.2d 399, 402 (Tex. App. 1995) ("assum[ing] without deciding that Article 2.41(G) [of the Business Corporation Act] eliminates the trust fund theory cause of action.").

In this case, Plaintiff does not rely on the trust fund doctrine as a separate claim for relief; rather, Plaintiff seeks to extrapolate the fiduciary duty apparently owed to creditors pursuant to the trust fund doctrine and rely on it to establish that Mr. O'Malley had a duty to disclose to Plaintiff that Indiana Corn was insolvent. (Resp. at 11; Pl.'s Sur-Reply [105-1] at 2.) Defendants, citing Delaware law, object to this tactic, urging that Plaintiff has no direct action for breach of fiduciary duty under the trust fund doctrine, which can only be pursued as a derivative claim. (Reply at 5–6.)

As explained earlier, however, Indiana's choice of law rules do not recognize the principle of *dépeçage.* Texas law therefore applies to each element of Plaintiff's fraud claim, yet because the trust fund doctrine imposes a fiduciary relationship on directors and creditors of an insolvent corporation, the doctrine governs the "internal affairs" of the corporation, which, under Indiana's choice of law rules, would be governed by the law of the state of incorporation. *See Nagy v. Riblet Products Corp.*, 79 F.3d 572, 576 (7th Cir. 1996); *Cooper Indus., LLC v. City of South Bend*, 899 N.E.2d 1274, 1290 (Ind. 2009) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 301–02). The same choice of law principle applies to limited liability companies. *See*

---

[6]    The cases cited by both parties do not disavow the trust fund doctrine, but instead debate whether it applies when the corporation is in the "zone of insolvency." *See Prostok v. Browning*, 112 S.W.3d 876, 908 n.41 (Tex. App. 2003) *rev'd in part on other grounds* 165 S.W.3d 336 (Tex. 2005) ("question[ing]" whether the trust fund doctrine "exists outside of the dissolution of a corporation") (cited in Defs.' Mot. at 7), *with Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 534 n.24 (5th Cir. 2004) (citing Texas and Delaware law and concluding that "when a corporation reaches the 'zone of insolvency', as with actual insolvency, the officers and directors have an expanded fiduciary duty to all creditors of the corporation") (cited in Resp. at 11.)

IND. CODE § 23-18-11-1(a). Indiana Corn is a Delaware limited liability company, and therefore, whether Mr. O'Malley owed Plaintiff a fiduciary duty under the trust fund doctrine should be governed by Delaware law. While the scope of the trust fund doctrine in Texas in uncertain, Delaware law (for which Plaintiff itself has argued (Resp. at 11 n. 7)) simply does not recognize the trust fund doctrine as applied to Delaware limited liability companies.[7] As creditors of Delaware limited liability companies have no claim for breach of fiduciary duty under the trust fund doctrine, *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007) (limiting actions under the trust fund doctrine to derivative claims); *CML V, LLC*, 6 A.3d at 253–54, Plaintiff may not rely on the doctrine here to establish that Mr. O'Malley owed it a fiduciary duty.

### d.    Duty to disclose under resulting trust theory

Finally, Plaintiff asserts that Mr. O'Malley breached a duty to disclose "material facts" when he owed Plaintiff a duty to do so "imposed by the resulting trust that arose on the funds paid by ConAgra." (Am. Compl. ¶ 54.) As Plaintiff sees things, a resulting trust was created by the sublease between Indiana Corn and ConAgra, making O'Malley trustee of the sublease proceeds, held in trust for Plaintiff, and creating a fiduciary relationship between O'Malley and Plaintiff. (*Id.* ¶¶ 61–62.)

Under Texas law, a resulting trust will not be implied at law when there is an express contract, as "the proper application of an equitable theory presupposes the lack of an adequate remedy at law, and relief for it is not usually available when there is a contract that covers the subject." *Monroe v. Goff*, No. 11-10-00102-CV, 2012 WL 1494802 at *6 (Tex. App. Apr. 30,

---

[7]    In *CML V, LLC v. Bax*, 28 A.3d 1037 (Del. 2011), the Delaware Supreme Court held that "[t]he [Delaware Limited Liability Company] Act, by its plain language, *exclusively* limits derivative standing to 'member[s]' or 'assignee[s],'" thereby "deny[ing] derivative standing to creditors who are not members or assignees of membership interests." 28 A.3d at 1041 (emphasis in original). The court acknowledged that this scheme differed from Delaware law governing corporations, but reasoned that the legislature "is free to elect a statutory limitation on derivative standing for LLCs that is different than that for corporations, and thereby preclude creditors from attaining standing. . . ." *Id.* at 1043.

2012) (rejecting appellee's characterization of resulting trust remedy as the enforcement of a prior oral contract between the parties, and reasoning that "[b]ecause it is a resulting trust case, it cannot also be a contract case"); *see also Savell v. Savell*, 837 S.W.2d 836, 839 (Tex. App. 1992). Here, there are two relevant contracts: the lease between Plaintiff and Indiana Corn, and the sublease between Indiana Corn and ConAgra, which incorporates the lease by reference. The parties' intentions concerning payments on the lease and sublease are all expressly governed by contract. (*See* Lease art. 4; Sublease ¶¶ 3, 4.1–4.4.) As a result, Plaintiff may not use the resulting trust doctrine to establish that Mr. O'Malley owed it a fiduciary duty concerning the sublease payments.

### 2. Mr. O'Malley's knowledge and intent alleged generally

Plaintiff's allegations establish a plausible claim that Mr. O'Malley, acting on behalf of Indiana Corn, made affirmative misrepresentations, which he knew to be false, and failed to disclose material facts when he had a duty to do so, intending that Plaintiff rely on the representations in order to obtain and profit from a railcar lease with Plaintiff. Defendants do not dispute these two elements of Plaintiff's fraud claim.

### 3. Plaintiff relied on Mr. O'Malley's representations causing it injury

Finally, Plaintiff has generally alleged reliance on Mr. O'Malley's misrepresentations and resulting injury. In its amended complaint, Plaintiff claims that it did not know, and "had no way of knowing or learning" the material facts, which O'Malley misrepresented before the parties signed the lease. (Am. Compl. ¶¶ 56, 58.) Plaintiff allegedly relied on O'Malley's misrepresentations when it chose to enter into the lease, causing it $9,000,000[8] in monetary damages when Indiana Corn failed to pay rent. (*Id.* ¶¶ 59, 63, 66.)

In order to prove fraud, Plaintiff must establish that its reliance was both actual and justifiable. When the representation is made in a business or commercial context, courts

---

[8]     As noted, the unpaid lease obligation, without interest, is less than $1 million. The $9 million damage calculation is unexplained.

consider the "nature of the relationship [between the parties] and the contract." *Coastal Bank ssb v. Chase Bank of Texas, N.A.*, 135 S.W.3d 840, 843 (Tex. App. 2004). Generally, reliance is "not justified when the representation takes place in an adversarial context," as "[a] party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests . . . ." *Id.* Whether a plaintiff's reliance is justifiable is generally a question of fact, but Texas courts have decided it as a matter of law in certain circumstances. *Compare, e.g., 1001 McKinney Ltd. v. Credit Suisse First Boston Mortgage Capital*, 192 S.W.3d 20, 30 (Tex. App. 2005) (fact), *with Coastal Bank*, 135 S.W.3d at 841 (law).

Defendants argue that Plaintiff's reliance on O'Malley's alleged misrepresentations was not justified for three reasons. First, Defendants argue that Plaintiff's reliance on O'Malley's alleged misrepresentations about Indiana Corn's financial condition was unreasonable because Plaintiff had a general obligation to exercise due diligence, and under Article 29[9] of the Lease, had a right to obtain financial statements from Indiana Corn. (Defs.' Mot. at 6; Reply at 4–5.) Because Plaintiff does not allege that it reviewed the financial statements to which it was entitled, Defendants argue, Plaintiff did not exercise ordinary care, and may be "charged with knowledge of all facts which would have been discovered by a reasonably prudent person similarly situated." (Reply at 4–5) (quoting *Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1963) (citation omitted).) This argument need not detain the court. Plaintiff was entitled to rely on representations made between March 2006 and March 2007, as Article 29 did not become effective until Plaintiff and Indiana Corn signed the lease on March 13, 2007.

Second, Defendants argue that any alleged affirmative misrepresentations made by Mr. O'Malley before March 13, 2007 are not actionable because reliance is "barred" by the lease's

---

[9] Article 29 provides: "[Indiana Corn] will furnish to [Plaintiff] within one hundred twenty (120) days after the end of each fiscal year of [Indiana Corn] a complete financial statement package of [Indiana Corn], for such fiscal year ended period, including but not limited to, balance sheet, income statement, cash flow statement, and all schedules, notes, and disclosures made a part of such financial statement package. . . ." (Lease, art. 29.)

merger and integration clause.[10] (Defs.' Mot. at 6–7) (citing *Playboy Enterprises*, 202 S.W.3d at 258.) In *Italian Cowboy*, the Texas Supreme Court explained, however, that "a merger clause—as distinct from a specific disclaimer-of-reliance clause—may not, by itself, bar an action to set aside a contract based on fraudulent inducement." 341 S.W.3d at 336 n.7. Defendants interpret *Italian Cowboy* as limited to actions where the plaintiff alleges fraudulent inducement or seeks to rescind the contract. (Reply at 4 n.1.) Plaintiff does allege fraudulent inducement in this case, however, and, in any event, *Italian Cowboy* holds more broadly that standard merger clauses do not, as a matter of law, bar reliance on oral representations, where there is no "clear and unequivocal" disclaimer of reliance.

Finally, Defendants argue that Plaintiff has not alleged justifiable reliance. In support, Defendants cite two Texas appellate court cases, *Coastal Bank* and *Swank v. Sverdlin*, 121 S.W.3d 785 (Tex. App. 2003). Neither *Coastal Bank* nor *Swank* is like this case. In *Coastal Bank*, the court held that plaintiff's reliance on an oral representation made by defendant's employee was unjustified as a matter of law in part because plaintiff had agreed in writing to conduct its own independent analysis and waive reliance on defendant's representations. 135 S.W.3d at 841, 843–44. In *Swank*, reliance was unjustified because the alleged misrepresentations were made by third-party investors in an adversarial context, during contract negotiations, and were contradicted by the terms of the final contracts. 121 S.W.3d at 803. Article 33 of the lease agreement at issue here contains no express disclaimer of reliance nor any provision that would make the Plaintiff's reliance unjustifiable. The misrepresentations allegedly made between March 2006 and March 2007 took place in an apparent arm's-length transaction, but, as even *Coastal Bank* observed, the parties' relationship is only a "factor to be considered" in determining whether reliance was justified. 135 S.W.3d at 843. Defendants have

---

[10] Article 33 of the Lease contains the merger clause, which provides: "This Lease, together with any and all exhibits attached hereto, constitutes the entire agreement between [Plaintiff] and [Indiana Corn], and it shall not be amended, altered or changed except by written agreement signed by the parties hereto." (Lease, art. 33.)

not convinced the court that the reasonableness of Plaintiff's reliance here may appropriately be determined at the pleading stage.

## IV.     Count II: Alter Ego

### A.     Choice of Law

Because Indiana Corn is organized in Delaware, the parties agree that Delaware law controls Plaintiff's alter ego claim. (Resp. at 13 n.9; Defs.' Mot. at 8.) Indeed, under Indiana choice of law principles, the state of organization controls claims concerning the entity's internal affairs. *Cooper Indus.*, 899 N.E.2d at 1290; *see also Chapel Ridge Invs., L.L.C. v. Petland Leaseholding Co., Inc.*, No. 1:13-CV-00146-PPS, 2013 WL 6331095 at *2 (N.D. Ind. Dec. 4, 2013) (applying law of state of incorporation to veil-piercing claim). The court will apply Delaware law.

### B.     Merits

To pierce the corporate veil under an alter ego theory, Plaintiff must allege that "the corporate structure cause fraud or similar injustice." *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) (quoting *Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del. 1996)). The entity need not have been "created with fraud or unfairness in mind," nor must plaintiff prove actual fraud, so long as it shows "a mingling of the operations of the entity and its owner plus an 'overall element of injustice or unfairness.'" *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008) (applying Delaware law). The same inquiry governs a veil-piercing claim for a limited liability company. *Id.* at 178. In such a case, the court will consider: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, No. CIV.A. 3184-VCP, 2008 WL 4057745 at *12 (Del. Ch. Sept. 2, 2008).

Plaintiff pleads facts sufficient to state a claim to disregard Indiana Corn's organizational structure and hold Mr. O'Malley liable under an alter ego theory. Contrary to Defendants' assertion, Plaintiff need not plead that the "corporate form itself was a fraud" in order to pierce the corporate veil. (*See* Defs.' Mot. at 8.) Rather, Plaintiff need only plead an injustice "in the use of the corporate form." *See, e.g., Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 473 (D. Del. 2010) (holding that plaintiffs stated an alter ego claim with allegations "that [defendants] misdirected funds, exercised crippling control, and purposely siphoned profits"); *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1304 (D. Del. 1990).

Plaintiff alleges that Mr. O'Malley used Indiana Corn's organizational form in order to perpetrate a scheme to defraud Plaintiff by leasing railcars on behalf of Indiana Corn, subleasing them to a third party, and keeping the proceeds. (Am. Compl. ¶ 78.) Defendants suggest that Plaintiff has "pled itself out of a veil-piercing claim" by alleging both that Indiana Corn was an "empty shell," and that Indiana Corn received regular sublease proceeds from ConAgra. (Defs.' Mot. at 8–9.) The court sees no inconsistency in Plaintiff's allegation that O'Malley funneled the sublease proceeds from Indiana Corn to other entities he controlled, leaving Indiana Corn an "empty shell." Nor would this factor alone be dispositive; whether Indiana Corn was sufficiently capitalized to make regular lease payments is only one factor considered in imposing alter ego liability.

Plaintiff also alleges facts to support each of the factors relevant to piercing the corporate veil. *See EBG Holdings*, No. CIV.A. 3184-VCP, 2008 WL 4057745 at *12. Plaintiff alleges that Indiana Corn was undercapitalized from inception, and has been insolvent "since at least 2006," because it had sold most of its assets in September 2006, and its debts and liabilities greatly exceeded its assets.[11] (Am. Compl. ¶¶ 46, 71, 74.) Furthermore, Plaintiff

---

[11] Defendants complain that evidence of insolvency, on its own, is insufficient to pierce the corporate veil. (Defs.' Mot. at 9) (citing *Mason v. Network of Wilmington, Inc.*, No. Civ. A. 19434-NC, 2005 WL 1653954 at **3-4 (Del. Ch. July 1, 2005).) The court agrees. Yet unlike the plaintiff in *Mason*, Plaintiff alleges that Indiana Corn's insolvency is the consequence

asserts that Indiana Corn failed to observe corporate formalities: the company did not maintain accurate financial records, including an account of members' capital contributions (*id.* ¶ 73); Indiana Corn did not "timely and properly file tax returns" or declare dividends (*id.*); its board of directors did not approve the lease (*id.* ¶ 72); and Defendants have no meeting minutes or articles of organization for Indiana Corn. (*Id.*) Plaintiff asserts, further, that O'Malley funneled the sublease proceeds from Indiana Corn to other entities in which he had an interest, transactions that were neither properly documented nor authorized by Indiana Corn's board of directors. (*Id.* ¶¶ 34–39, 77.) Finally, Plaintiff alleges that O'Malley "controlled and dominated" Indiana Corn, HBE, and Defendants Putnam Energy and Midwest Gas, and used his "complete control" to "intermingle[] [the] cash, employees, and assets" of these companies. (*Id.* ¶¶ 25, 42.) Together, Plaintiff's allegations regarding Mr. O'Malley's "scheme" to defraud Plaintiff, and the factors evidencing misuse of Indiana Corn's corporate form to execute it, state a claim for veil piercing under an alter ego theory of liability.

Defendants also urge that because Plaintiff has alleged specific transfers from Indiana Corn to other individuals and entities, there is no need to pierce the corporate veil, as Plaintiff may simply seek recovery from the transferees. (Defs.' Mot. at 9–10; Reply at 6.) The fact that the alleged transfers may be (and indeed are) challenged as fraudulent transfers (Count 5) does not preclude the alternative remedy. The funds allegedly transferred to Defendants from Indiana Corn, excluding Mr. O'Malley's alleged personal expenses and transfers to HBE alone, total $547,879; Indiana Corn's failure to make any lease payments from June 2007 to March 2008 likely caused Plaintiff at least $877,500 in damages. Plaintiff is not entitled to a double recovery, but is entitled to assert more than one legal theory.

---

of Mr. O'Malley's scheme to defraud. *See Mason*, No. Civ. A. 19434-NC, 2005 WL 1653954 at **3–4.

## V.     Count III: Tortious Interference

### A.     Choice of Law

Neither party directly addresses the question of what state's law will apply to Plaintiff's tortious interference claim, but they appear to agree that Texas law applies.  (*See* Am. Compl. ¶ 12; Defs.' Mot. at 5.)   The court assumes the same. *See Mass. Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1120 (7th Cir. 1998) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies.") (citation omitted).

### B.     Merits

Defendants have not challenged Plaintiff's tortious interference claim against Mr. O'Malley, and the court agrees that Plaintiff has stated such a claim by alleging: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).   Plaintiff alleges that it signed the lease with Indiana Corn on March 13, 2007 (Am. Compl. ¶ 83), and that Mr. O'Malley interfered with the lease by acting in his personal interest, and "contrary to the interests of Indiana Corn," by directing financial transfers from Indiana Corn to himself, Defendants Putnam Energy and Midwest Gas, and to HBE, for which Indiana Corn received no consideration.  This conduct rendered Indiana Corn unable to pay Plaintiff until March 2008, and caused Plaintiff injury.  (Am. Compl. ¶¶ 34-39, 47, 83–84, 87.)  This is sufficient to state a claim for tortious interference. *See Holloway v. Skinner*, 898 S.W.2d 793, 796 (Tex. 1995) (person acting as agent for contracting party may be liable for tortious interference if he "acted in a fashion so contrary to the corporation's best interests that his actions could only have been motivated by personal interests").

**VI.      Count IV: Fraudulent Transfer**

**A.      Choice of Law/ Timeliness**

While both parties agree that Texas law applies to Plaintiff's fraudulent transfer claim, Plaintiff argues that because Indiana's procedural law applies to this suit, Indiana's statute of limitations for fraudulent transfer claims also should apply.  (Resp. at 16.)  Defendants, on the other hand, urge that the Texas Uniform Fraudulent Transfer Act ("TUFTA"), contains a statute of repose, not limitations, which applies to Plaintiff's claim.  (Reply at 7–8.)  The court concludes that Defendants are correct that TUFTA's statute of repose applies here, but also concludes that Texas law recognizes an exception to the statute of repose for discovery, and that Plaintiff's allegations are sufficient to trigger that exception.

Under Indiana law, as Plaintiff notes, "statutes of limitations are procedural in nature" and therefore, under Indiana's choice of law rules, the law of the forum state, Indiana, governs the statute of limitations.  *E.g.*, *1st Source Bank v. Village of Stevensville*, No. 3:11-CV-205-TLS, 2012 WL 2308647 at *3 (N.D. Ind. June 18, 2012) (citations omitted).  On the other hand, statutes of repose "vest in defendants a substantive right to immunity," by "mark[ing] the outer boundaries of substantive legal rights because they limit the time period during which a cause of action can arise. . . ."  *Gill v. Evansville Sheet Metal Works, Inc.*, 970 N.E.2d 633, 637 n.4 (Ind. 2012).  Because statutes of repose are substantive in nature, unlike statutes of limitations, under Indiana's choice of law rules they are governed by the state law that governs the substantive cause of action.  *See Simon*, 805 N.E.2d at 801–02.

TUFTA contains a statute of repose with a discovery exception.  *See Nathan v. Whittington*, 408 S.W.3d 870, 874 (Tex. 2013).  Section 24.010(a) provides that "a cause of action with respect to a fraudulent transfer or obligation under this chapter is *extinguished* unless action is brought" generally, "within four years after the transfer was made or obligation incurred," or, for certain fraudulent transfers, "within one year after the transfer or obligation was or could reasonably have been discovered by the claimant."  Tex. Bus. & Comm. Code

§ 24.010(a) (emphasis added). In *Nathan*, after surveying caselaw from Texas and other states, as well as the comments of the National Conference of Commissioners on Uniform State Laws, the Texas Supreme Court concluded that § 24.010(a) is a statute of repose. 408 S.W.3d at 874 (citing *Janvey v. Democratic Senatorial Campaign Comm.*, 793 F. Supp. 2d 825, 830-31 n.5 (N.D. Tex. 2011); *Zenner v. Lone Star Striping & Paving, L.L.C.*, 371 S.W.3d 311, 315 n.1 (Tex. App. 2012)). The *Nathan* court did not address the apparent discovery exception in § 24.010(a)(1), but both *Democratic Senatorial* and *Zenner* recognized it. *Democratic Senatorial*, 793 F. Supp. 2d at 830; *Zenner*, 371 S.W.3d at 315; *see also Cadle Co. v. Wilson*, 136 S.W.3d 345, 350 (Tex. App. 2004). Because both parties agree that Texas law governs the substance of Plaintiff's fraudulent transfer claim, it is subject to TUFTA's statute of repose and discovery exception. Here, the alleged fraudulent transfers occurred between November 30, 2006 and May 2008, and Plaintiff claims to have discovered them on October 19, 2011. (Am. Compl. ¶ 67.) On November 29, 2011, Plaintiff initiated this lawsuit.

### B. Merits

#### 1. TUFTA's Statute of Repose

Defendants seek to dismiss Plaintiff's fraudulent transfer claims by asserting first, that TUFTA's statute of repose extinguishes all but one such claim. (Defs.' Mot. at 10.) Furthermore, Defendants argue, because TUFTA is a statute of repose, it does not permit "toll[ing]" (*Id.* at 11) (citing *Duran*); and, in the alternative, none of the fraudulent transfers were "inherently undiscoverable" because (a) Plaintiff had a right to review Indiana Corn's financial statements, and (b) after 2009, Plaintiff conducted discovery to enforce the default judgment against Indiana Corn. (*Id.* at 10–11.)

Section 24.010 is indeed a statute of repose, but Defendants ignore plain language in § 24.010(a)(1) that Texas courts have categorized as a type of discovery rule exception. *See, e.g., Duran*, 71 S.W. 3d at 838. In any event, "a plaintiff is not required to plead facts in the complaint to anticipate or defeat affirmative defenses." *Indep. Trust Corp. v. Stewart Info.*

*Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). A court will only dismiss a cause of action based on an affirmative defense "when a plaintiff's complaint . . . sets out all of the elements of an affirmative defense," and demonstrates that the action is not timely. *Id.* Because TUFTA's statute of repose contains a discovery rule exception, dismissal is inappropriate. Whether Plaintiff reasonably should have discovered the fraudulent transfers earlier is a question of fact, to be resolved by a jury (or on a summary judgment record). *Duran*, 71 S.W. 3d at 839.

### 2.    Alleged Fraudulent Transfers

TUFTA protects the interests of creditors by "prevent[ing] debtors from placing property beyond the reach of creditors with the intent to defraud those creditors." *C.M. Asfahl Agency v. Tensor, Inc.*, 135 S.W.3d 768, 787–88 (Tex. App. 2004). In practice, TUFTA "operates to void certain fraudulent 'transfers.'" *Janvey v. Alguire*, 846 F. Supp. 2d 662, 671 (N.D. Tex. 2011). The Act defines such transfers as ones (a) made "with actual intent to hinder, delay, or defraud any creditor of the debtor," or (b) made "without receiving reasonably equivalent value in exchange" when "the debtor was insolvent at that time or . . . became insolvent as a result." TEX. BUS. & COMM. CODE §§ 24.005(a)(1); 24.006(a). Section 24.005(b) lists various factors[12] that a court may consider as "badges of fraud" in determining whether a debtor had "actual intent" to perform a fraudulent transfer, which is a question of fact. *Hahn v. Love*, 321 S.W.3d 517, 525-26 (Tex. App. 2009). A plaintiff may seek to void transfers against initial transferees, subsequent transferees, or "the person for whose benefit the transfer was made;" but transfers

---

[12]    These include whether: "(1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." TEX. BUS. & COMM. CODE § 24.005(b).

to good faith, bona fide purchasers and their subsequent transferees are not voidable. TEX. BUS. & COMM. CODE § 24.009(a)–(b).

Courts interpreting TUFTA have not definitively determined whether claims must satisfy the federal pleading standard for fraud. *See Alguire*, 846 F. Supp. 2d at 675–76 (observing that the pleading standard under TUFTA "appears to be an open question in the Fifth and some other circuits"); *Biliouris v. Sundance Res., Inc.*, 559 F. Supp. 2d 733, 736 (N.D. Tex. 2008) (same). Regardless, as explained below, the court finds that Plaintiff satisfies even the heightened pleading standard by pleading the alleged transfers to Mr. O'Malley, Putnam Energy, and Midwest Gas with particularity. Plaintiff's fraudulent transfer claim against Ms. O'Malley is dismissed.

### a. Fraudulent Transfer under § 24.005(a)(1)

Plaintiff states a claim for fraudulent transfer against Mr. O'Malley, Putnam Energy, and Midwest Gas under § 24.005(a)(1).[13] Plaintiff alleges with particularity that the following transfers were made "before or within a reasonable time after" Plaintiff and Indiana Corn entered into the Lease in March 2007 to Mr. O'Malley, Putnam Energy, and Midwest Gas:

- $100,000 to Putnam Energy on November 30, 2006 (pre-Lease). (Am. Compl. ¶ 93.)

- $191,535.06 for various payments on behalf of Putnam Energy and Midwest Gas between January and April 2007 (pre-Lease). (*Id.* ¶ 27.)

- $40,292 to Graysons on behalf of Putnam Energy on July 26, 2007. (*Id.* ¶ 35.)

- $2,500 to Richard Moore on behalf of Midwest Gas on August 15, 2007, and five other similar payments. (*Id.* ¶ 36.)

- $6,000 to S & S Construction on behalf of Putnam Energy and Midwest Gas on July 31, 2007. (*Id.* ¶ 35.)

- $50,000 to Mr. O'Malley on November 26, 2007. (*Id.* ¶ 39.)

---

[13] Plaintiff claims that Indiana Corn paid $19,432 for insurance, but fails to specify who, if any, of Defendants benefited from this transaction, or the date on which it took place. (Am. Compl. ¶ 37.) As a result, the court finds that this particular alleged transfer does not state a claim for fraudulent transfer under TUFTA.

- $46,000[14] to Mr. O'Malley between January and April 2008. (*Id.* ¶ 97.)

In addition to transferring funds to Defendants, Plaintiff also alleges that Indiana Corn transferred approximately $963,321 to HBE, another entity in which Mr. O'Malley has an interest—specifically $230,000 before the Lease (Am. Compl. ¶¶ 25–26), and $632,000 after. (*Id.* ¶¶ 34–39, 41, 97.)[15] Defendants urge that because HBE is not a named party, Plaintiff may not pursue a fraudulent transfer claim with respect to any transfers made from Indiana Corn to HBE. (Defs.' Mot. at 11.) Plaintiff has alleged, however, that between October 2007 and May 2008, HBE transferred "some" funds to or on behalf of Defendants, as well:

- An unspecified amount for various personal expenses on behalf of Mr. O'Malley in October 2007. (Am. Compl. ¶¶ 38, 95.)

- $29,403.34 real estate taxes on behalf of Mr. O'Malley on February 14, 2008. (*Id.* ¶ 97.)

- $69,648.42 in payroll on behalf of Midwest Gas and Putnam Energy between November 2007 and May 2008. (*Id.*)

As Defendants acknowledge (Defs.' Mot. at 11), in addition to initial transferees, § 24.009 imposes liability on "any subsequent transferee other than a good faith transferee who took for value." TEX. BUS. & COMM. CODE § 24.009(b)(1)–(2). This covers HBE's transfers to and on behalf of Mr. O'Malley, Putnam Energy, and Midwest Gas. In total, Plaintiff states a claim for the $99,052 allegedly transferred from HBE to or on behalf of Defendants, plus the unspecified amount for Mr. O'Malley's personal expenses. Because HBE is not a named

---

[14] Plaintiff does not specify whether the transferor was Indiana Corn or HBE, but neither Mr. O'Malley nor HBE received the transfers in good faith for value (*id.* ¶ 92(b)), so the transfer may qualify as fraudulent regardless of whether the transferor was HBE or Indiana Corn. *See* TEX. BUS. & COMM. CODE § 24.009(a)–(b).

[15] Plaintiff also alleges that Indiana Corn paid $101,321 for payroll on behalf of HBE on an unspecified date. (Am. Compl. ¶ 97.) Though Plaintiff alleges numerous transfers to HBE, HBE is not a named party. For this reason, and because Plaintiff does not allege that these funds were transferred from HBE to Defendants, the court need not decide whether this alleged transfer satisfies the heightened pleading standard.

defendant here, however, Plaintiff has not stated a claim with respect to the approximately $864,269 transferred solely from Indiana Corn to HBE.

Plaintiff has also alleged sufficiently that Mr. O'Malley made each of these transfers "with actual intent to . . . defraud" Plaintiff. (Am. Compl. ¶ 92(b)). That general allegation satisfies Rule 9(b) and the "actual intent" factors identified in § 24.005(b). At least some of the alleged transfers were to Mr. O'Malley, who as president and CEO of Indiana Corn was an officer and/or "person in control" of the debtor, *see* TEX. BUS. & COMM. CODE § 24.002(7). Midwest Gas and Putnam Energy appear to have a "close relationship" with Indiana Corn that should "subject any transactions made between [Indiana Corn] and [Midwest Gas and Putnam Energy] to heavy scrutiny." *Hahn*, 321 S.W.3d at 526; (Am. Compl. ¶ 23.) Furthermore, Plaintiff alleges that all of the transfers were concealed; that the transfers made after March 2007 disposed of "substantially all" of Indiana Corn's assets (Am. Compl. ¶¶ 19, 62); that Indiana Corn was insolvent at the time of the transfers (*id.* ¶¶ 19, 47); and that Indiana Corn received no consideration in exchange. (*Id.* ¶ 92(b).)

### b.     Fraudulent Transfer under § 24.006(a)

Plaintiff has also sufficiently pleaded a claim for fraudulent transfer against Mr. O'Malley, Putnam Energy, and Midwest Gas under § 24.006(a) for transfers made after the lease. Both Indiana Corn and HBE (with funds from Indiana Corn) are alleged to have made various fraudulent transfers to or on behalf of Mr. O'Malley, Putnam Energy, and Midwest Gas, "without receiving reasonably equivalent value in exchange," (Am. Compl. ¶ 92(b)), that is, without consideration. *See New Millennium Capital Partners II, LLC v. Humitech Int'l Grp. Inc.*, No. 06-CV-1180-L, 2007 WL 1944459 at *4 (N.D. Tex. June 28, 2007) (plaintiff stated a fraudulent transfer claim by alleging that defendant did not receive reasonably equivalent value for the transfer); *but see In re Crescent Res., LLC*, No. 09-1507-CAG, 2012 WL 195528 at *2 (Bankr. W.D. Tex. Jan. 23, 2012) (dismissing fraudulent transfer claim when plaintiff alleged only that transferor "received less than the reasonably equivalent value in exchange"). Finally, Plaintiff

alleges that Indiana Corn was insolvent[16] at the time of the transfers because it had sold most of its assets in September 2006, but, after March 2007, was obligated to pay Plaintiff $97,500 each month, and because between June 2007 and March 2008, Indiana Corn did not make any lease payments. (Am. Compl. ¶¶ 19, 45–47, 57(a)–(c).)

### c.    Fraudulent Transfer against Ms. O'Malley

Plaintiff's fraudulent transfer claim is insufficient as against Ms. O'Malley, however. Plaintiff alleges only that Ms. O'Malley "owns 85% or more of the membership interests in Putnam Energy," which Mr. O'Malley transferred to her in "late 2007 or early 2008," and that she "owned or controlled" Midwest Gas. (Am. Compl. ¶¶ 9, 23, 114.) Plaintiff also generally alleges throughout the complaint that both Mr. and Ms. O'Malley received or benefited from transfers of sublease proceeds, personally and due to their interest in Putnam Energy and Midwest Gas. For example, Plaintiff alleges that "[Mr.] O'Malley transferred funds and assets belonging to Indiana Corn to [Mr.] O'Malley, [Ms.] O'Malley, Putnam Energy and Midwest Gas who are all transferees." (*Id.* ¶ 90.) This type of conclusory allegation is insufficient to state a fraudulent transfer claim against Ms. O'Malley.

Plaintiff urges that TUFTA's definition of "transferee" is "certainly broad enough to include marital property transfers." (Resp. at 24) (citing *Trigeant Holdings, Ltd. v. Jones*, 183 S.W.3d 717, 726 (Tex. App. 2005).) The only alleged transfer between the O'Malleys is of "membership interests" in Putnam Energy, a transfer Plaintiff contends was fraudulent because the sublease proceeds "were used to capitalize Putnam Energy." (Am. Compl. ¶ 114; Resp. at 25–26.) Plaintiff does not allege that Mr. O'Malley used any funds from Indiana Corn to purchase his interest, however, so the subsequent transfer to Ms. O'Malley is not an actionable "transfer" under TUFTA. *See* TEX. BUS. & COMM. CODE §§ 24.005(a); 24.006(a)–(b) (requiring

---

[16] Under TUFTA, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation," and a debtor may be presumed insolvent, if the debtor "is generally not paying the debtor's debts as they become due." TEX. BUS. & COMM. CODE § 24.003(a)-(b).

transfers to be made from debtor). Furthermore, Plaintiff has alleged a separate claim against Putnam Energy for fraudulent transfer; Plaintiff's attempt to bootstrap the same allegations to implicate Ms. O'Malley is unpersuasive. Unlike the defendants in *Trigeant*, who allegedly received an equitable interest in the property at issue, the only transfer alleged between the O'Malleys is unrelated to the alleged fraudulent transfers made by Indiana Corn. (Am. Compl. ¶ 114.)

Plaintiff is correct that "it is not necessary that specific transfers to any individual be identified," (citing *Alguire*, 846 F. Supp. 2d at 673 n.8), and that allegations of transfers on "information and belief," particularly concerning transfers between family members, may be sufficient. (Resp. at 24, 26 (citing *Murray v. Conseco, Inc.*, No. 1:03-cv-1701, 2008 WL 4690987 at **2-3 (S.D. Ind. Oct. 22, 2008) (applying Indiana's Uniform Fraudulent Transfer Act)).) Here, however, unlike *Alguire* or *Murray*, Plaintiff does not allege that Ms. O'Malley received *any* fraudulent transfer from Indiana Corn or its subsequent transferees, HBE or the other Defendants; the fact that she is married to Mr. O'Malley alone is simply not sufficient to state a claim for fraudulent transfer. Because the amended complaint is devoid of any facts that show that Ms. O'Malley received any fraudulent transfers, either as the initial transferee from Indiana Corn, or as a subsequent transferee from the other Defendants or HBE, the court dismisses the fraudulent transfer claim against Ms. O'Malley.

**VII.    Counts V-VII: Claims for "Money Had and Received," Unjust Enrichment, and Constructive Trust**

**A.    Choice of Law**

The parties also dispute what state's law applies to each of Plaintiff's equitable "claims"; Plaintiff urges that Texas law applies to all of them (Resp. at 26), while Defendants argue that Illinois law applies to "money had and received" and unjust enrichment, and accept Plaintiff's choice of law analysis for constructive trust. (Defs.' Mot. at 12, 14.) Neither party has identified any conflict between the relevant state's laws, however. Before the court undertakes a choice

of law analysis, it must first determine whether there is a "true conflict" between the different states' laws, however, and here, finding none, the court will apply the law of the forum state, Indiana. *See Jean v. Dugan*, 20 F.3d 255, 260 (7th Cir. 1994).

There is no true conflict concerning an equitable action for "money had and received," which permits recovery of money held by the defendant that in equity and good conscience belongs to the plaintiff. *Compare Kaiser v. Fleming*, 315 Ill. App. 3d 921, 735 N.E.2d 144, 147 (Ill. 2d Dist. 2000) ("An action for money had and received is maintainable where defendant has received money which in equity and good conscience belongs to the plaintiff.") (internal citation omitted), *with Staats v. Miller*, 243 S.W.2d 686, 687 (Tex. 1951) ("All plaintiff need show [in an action for money had and received] is that defendant holds money which in equity and good conscience belongs to him."). Indiana has a similar definition. *See Shirley v. Wilson*, 103 N.E.2d 805, 806 (Ind. 1952) ("[The action for money had and received] can be maintained in all cases where the defendant holds money of the plaintiff which in equity and good conscience he out to repay."). Though Indiana law describes money had and received both as an "action" and an "equitable remedy," *e.g., Chosnek v. Rolley*, 688 N.E.2d 202, 211 (Ind. Ct. App. 1997), this is an insignificant difference from Illinois or Texas law. Therefore, the court need not engage in a choice of law analysis and will apply Indiana law to Plaintiff's equitable claim for "money had and received."

Similarly, there is also no true conflict concerning the theory of unjust enrichment: a defendant is unjustly enriched when he unjustly retains a benefit that violates principles of justice and/or equity and good conscience. The leading Illinois case describes this claim as follows: "[A] plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 678-79 (Ill. 1989) (citations omitted). Texas law is in accord: "A party may recover under the unjust enrichment theory when one person has

obtained a benefit from another by fraud, duress, or the taking of undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41, 43 (Tex. 1992). And Indiana courts similarly explain that unjust enrichment occurs where "a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust." *Zoeller v. E. Chicago Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009) (internal citations omitted).

Notably, courts in each of these states have struggled with the issue of whether unjust enrichment is an independent cause of action, or instead, limited to an equitable remedy or theory of relief. In *Cleary v. Philip Morris Inc.*, the Seventh Circuit observed that Illinois cases have recognized unjust enrichment as both an "independent cause of action" and a theory that "cannot stand untethered from an underlying claim." The court "suggest[ed] one way to make sense" of these apparently conflicting opinions:

> Unjust enrichment is a common-law theory of recovery or restitution that arises when the defendant is retaining a benefit to the plaintiff's detriment, and this retention is unjust. What makes the retention of the benefit unjust is often due to some improper conduct by the defendant. And usually this improper conduct will form the basis of another claim against the defendant in tort, contract, or statute. So, if an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim— and, of course, unjust enrichment will stand or fall with the related claim.

656 F.3d 511, 516–17 (7th Cir. 2011) (footnote omitted). The Northern District of Texas arrived at a similar conclusion about unjust enrichment under Texas law. *See Hancock v. Chicago Title Ins. Co.*, 635 F. Supp. 2d 539, 560 (N.D. Tex. 2009) ("[U]njust enrichment is a theory of liability that a plaintiff can pursue through several equitable causes of action . . . but not as a separate and distinct claim."). And, while courts applying Indiana law have described unjust enrichment as a "claim," a "theory," and a "remedy," *e.g., Zoeller*, 904 N.E.2d at 221 (claim and remedy); *City of Mishawaka v. Kvale*, 810 N.E.2d 1129, 1136, 1139 n.3 (Ind. Ct. App. 2004) (all three), "[t]he pivotal concept of 'unjust enrichment' is the occurrence of a wrong or something unjust." *Savoree v. Indus. Contracting & Erecting, Inc.*, 789 N.E.2d 1013, 1020 (Ind. Ct. App. 2003).

Thus, under Illinois, Texas, or Indiana law, unjust enrichment is appropriate where the plaintiff alleges that the defendant engaged in wrongdoing that unjustly benefited the defendant. Here, Plaintiff alleges separate wrongdoing, specifically that Mr. O'Malley engaged in a scheme to defraud Plaintiff, and pleads a separate equitable claim for "money had and received." Whether the court finds Plaintiff's "claim" for unjust enrichment to be a theory, an equitable remedy, or a separate claim, will not make a significant difference in the outcome, and therefore, the court will apply Indiana law.

Finally, constructive trust: As noted, Defendants have not opposed Plaintiff's assertion that Texas law applies to this "claim," but there is no true conflict on this issue, either. In both Texas and Indiana, the court may impose a constructive trust where the defendant, by engaging in wrongdoing, is unjustly enriched by acquisition of traceable property which in equity and good conscience belongs to the plaintiff. *Compare Mowbray v. Avery*, 76 S.W.3d 663, 681 n.27 (Tex. App. 2002) (constructive trust requires "(1) Breach of an informal relationship of special trust or confidence arising prior to the transaction in question, or actual fraud; (2) Unjust enrichment of the wrongdoer; (3) Tracing to an identifiable res."), *with Zoeller*, 904 N.E.2d at 221 (constructive trust is "a relationship with respect to property subjecting the person by whom the title to the property is held to an equitable duty to convey it to another on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property") (quoting RESTATEMENT (SECOND) OF TRUSTS § 1 cmt. e (1959)).

Both states define constructive trust as an equitable remedy, not an independent cause of action. *See Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex. 1974); *Chosnek*, 688 N.E.2d at 211. Plaintiff nevertheless urges, citing two Texas appellate cases, that constructive trust is an independent claim under Texas law. (Resp. at 30.) In *Mowbray*, the Texas Court of Appeals observed that "while it is true that a constructive trust is an equitable remedy, it would be overly simplistic to state that therefore a suit for constructive trust cannot lie as a distinct cause of action." 76 S.W.3d at 681. No other Texas appellate court decisions have followed

the *Mowbray* court's characterization of constructive trust, however. The other case cited by Plaintiff, *Austin Lake Estates, Inc. v. Meyer*, is even less persuasive, as the court upheld the trial court's imposition of a constructive trust, which the plaintiff sought as an alternative *remedy* to monetary damages, and which the court defined as "an equitable remedy" to prevent wrongdoing. 557 S.W.2d 380, 381, 383 (Tex. App. 1977). Again, because there is no difference between Texas and Indiana law defining constructive trust that would affect the outcome of the case, the court will apply the law of the transferor forum state, Indiana.

### B. Merits

The three equitable "claims" in Counts 5 through 7 are interrelated under Indiana law. Unjust enrichment is a theory underlying equitable actions and remedies that describes the inequitable result of wrongful conduct. *Zoeller*, 904 N.E.2d at 220. In turn, "money had and received" is both an "action" and an "equitable remedy" appropriate where "[defendant] has received money . . . under such circumstances that in equity and good conscience he ought not to retain." *Chosnek*, 688 N.E.2d at 211 (citation omitted); *see also Shirley*, 103 N.E.2d at 807. Finally, a constructive trust is a remedy that imposes an equitable duty on the defendant to convey property to the plaintiff to avoid a specific type of unjust enrichment, when the defendant's "acquisition or retention of . . . *property* is wrongful." *Zoeller*, 904 N.E.2d at 221 (quoting RESTATEMENT (SECOND) OF TRUSTS § 1 cmt. e (1959)) (emphasis added). Each of these theories requires proof of wrongful conduct that, without a remedy, would result in the defendant's unjust enrichment.

### 1. Money Had and Received and Unjust Enrichment

Plaintiff's allegation are sufficient to state a claim for money had and received under a theory of unjust enrichment. Defendants Mr. O'Malley, Putnam Energy, and Midwest Gas were all unjustly enriched through Mr. O'Malley's alleged fraudulent scheme in that Indiana Corn failed to make any lease payments to Plaintiff until March 2008, and instead transferred ConAgra's sublease proceeds to Defendants, for which they paid no consideration. (Am.

Compl. ¶¶ 107–08.)  As discussed in Plaintiff's fraudulent transfer claim, Indiana Corn (or HBE, with Indiana Corn's funds) allegedly transferred $125,403 to Mr. O'Malley and paid his personal expenses in October 2007 (*id.* ¶¶ 38–39, 95, 97); $140,292 to or on behalf of Putnam Energy (*id.* ¶¶ 35, 93); $15,000 to or on behalf of Midwest Gas (*id.* ¶ 36); and $267,183.48 to or on behalf of Putnam Energy and Midwest Gas.  (*Id.* ¶¶ 27, 35, 97.)  Plaintiff also appears to seek recovery on a theory of unjust enrichment for the full value of the damages incurred because of Indiana Corn's breach of contract ($877,500 before adding interest).  Plaintiff's "money had and received" claim relates only to the specific transfers allegedly received by, and possibly the value of benefits conferred on, Mr. O'Malley, Putnam Energy, and Midwest Gas from Indiana Corn (or HBE), not to the entirety of Indiana Corn's breach of contract.  Any, as with Plaintiff's fraudulent transfer claim, Plaintiff has not alleged that Ms. O'Malley was unjustly enriched, and Counts 5, 6, and 7 will be dismissed as against her.

Defendants argue that Plaintiff has failed to state a claim for "money had and received/unjust enrichment" because Plaintiff has an adequate remedy at law, in a suit against Indiana Corn for breach of contract, and "[i]n fact, [Plaintiff] has already obtained that legal remedy" through a default judgment, and "is not entitled to an additional equitable remedy." (Defs.' Mot. at 13.)  Plaintiff responds that its default judgment against Indiana Corn is "worthless" because Defendants stripped Indiana Corn of all its assets.  (Resp. at 29 n.23.) Defendants are correct that where there is an adequate remedy at law, for example where an express contract governs the conduct at issue, the plaintiff may not pursue an equitable remedy. *Kohl's Ind., L.P. v. Owens*, 979 N.E.2d 159, 168 (Ind. Ct. App. 2012).  In this case, Plaintiff's claims arose when it discovered, in attempting to enforce the default judgment, that Indiana Corn was judgment proof because of Mr. O'Malley's alleged scheme.  It is for this conduct (stripping Indiana Corn of its assets and sublease proceeds), not Indiana Corn's breach of contract *per se*, that Plaintiff seeks an equitable remedy. As Defendants acknowledge, they are not parties to the Lease (Reply at 9), and therefore, are not directly liable for the default

judgment. Plaintiff's state court suit for breach of contract did not, and in fact could not, address the issues raised by Plaintiff here, for which Plaintiff properly seeks an equitable remedy.

Defendants also argue that Plaintiff has failed to plead a cause of action for "money had and received/unjust enrichment" because Plaintiff does not explain the relationship between Defendants' enrichment and Plaintiff's impoverishment. (Defs.' Mot. at 13–14.) The court disagrees. Indiana Corn allegedly sold most of its assets before it entered into the lease with Plaintiff (Am. Compl. ¶¶ 19, 57(a)–(c)), and, after March 2007, Indiana Corn's only income was the sublease proceeds, with Plaintiff its sole creditor. (*Id.* ¶¶ 60, 62.) In light of these allegations, it is plausible that the funds allegedly transferred out of Indiana Corn to Defendants, were the sublease proceeds; and, as Indiana Corn had no other apparent means to pay its lease obligations, Plaintiff was arguably entitled to the sublease proceeds.

### 2. Constructive Trust

As explained earlier, constructive trust (the subject of Count 7) is an equitable remedy, not an independent cause of action. *Zoeller*, 904 N.E.2d at 221; *see also Zygulski*, 236 B.R. at 652. A court will impose a constructive trust where the defendant has wrongfully acquired or retained property that in equity belongs to the plaintiff, and would be unjustly enriched by keeping it. *Id.*; *see also Estates of Kalwitz v. Kalwitz*, 717 N.E.2d 904, 912 (Ind. Ct. App. 1999). A constructive trust claim ordinarily involves a particular property, or res, not simply a monetary remedy. *See Great-W Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212–14 (2002). When the court imposes a constructive trust, the defendant's only obligation with respect to the property at issue is to convey it back to the plaintiff. *Zoeller*, 904 N.E.2d at 221.

In this case, the imposition of a constructive trust on the monetary transfers to Defendants Mr. O'Malley, Putnam Energy, and Midwest Gas is superfluous to Plaintiff's claim for "money had and received." Nor does Plaintiff seek to recover specific property from Defendants, instead claiming a right to assets "of the *value* of Indiana Corn's transferred funds." (Am. Compl. ¶¶ 116–17) (emphasis added.) The court may impose a constructive trust only on

traceable property wrongfully acquired or retained by Defendants,[17] and Plaintiff has identified no such property here.  Plaintiff claims that it is entitled to a constructive trust on Ms. O'Malley's membership interest in Putnam Energy because Putnam Energy was "capitalized" with the sublease proceeds (*id.* ¶ 114), but does not allege that Ms. O'Malley (or Mr. O'Malley who transferred the interest) used any sublease proceeds to purchase that interest.   Similarly, Plaintiff asks the court to establish a constructive trust on Midwest Gas's oil and gas leasehold estates, various assets to store natural gas, two completed pipelines, and easements for another planned pipeline, but alleges only that "Indiana Corn paid the expenses, in part, for Midwest Gas to *develop* these assets." (*Id.* ¶¶ 115–116) (emphasis added.)  Constructive trust is also not an appropriate remedy for recovery of "any growth, profit or benefit from the transferred funds" (*Id.* ¶¶ 116–17); *see* RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 55 cmt. f (2011) ("Proof that property of the defendant has been enhanced in value at the expense of the claimant may suffice to support specific relief in the form of an equitable lien, but it will not justify a remedy that awards ownership of the property to the claimant.").   The equitable remedy of constructive trust is available to Plaintiff, if at all, only insofar as the transferred funds from Indiana Corn (or through HBE) to Defendants Mr. O'Malley and Midwest Gas are traceable and identifiable.

---

[17]    *See* RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 55 cmt. h (2011) ("[T]he effect of constructive trust is to vindicate a claim to equitable ownership. . . . If the claimant cannot show an equitable entitlement to specific property in the hands of the defendant, the underlying basis of the remedy is lost. Recognizing a 'constructive trust' over untraceable property–a contradiction in terms–would allow the claimant to select particular assets of the defendant and take them in satisfaction of a nonspecific liability in restitution. Constructive trust has no such effect.").

## CONCLUSION

Defendants' motion to dismiss [93] is granted in part and denied in part. Count 9 (constructive trust) is dismissed, as are all claims against Ms. O'Malley. Plaintiff has stated a fraud claim based upon Mr. O'Malley's pre-lease representations, but not based on representations he made after Plaintiff had sued Indiana Corn and repossessed the rail cars. Count I (fraud) is therefore dismissed in part. The motion is otherwise denied.

ENTER:

Dated: March 21, 2014

United States District Judge